IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| MAIRE WICHARD, IN HER CAPACITY | ) | |
| AS EXECUTOR OF THE ESTATE OF | ) | |
| GARY WICHARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:15cv3 (JCC/TCB) |
| | ) | 1:15cv83 (consolidated case) |
| TERRELL SUGGS, | ) | |
| | ) | |
| Respondent. | ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on a petition to
confirm an arbitration award under the Federal Arbitration Act
("FAA").  The underlying arbitration award involved a contract
dispute between Terrell Suggs, a professional football player,
and his former agent, Gary Wichard.  The arbitrator found in
favor of Mr. Wichard's estate and awarded the estate $172,800.00
in agent fees for the 2013 season.  Two motions are currently
pending before the Court: (1) the estate's motion to confirm[1] the
arbitration award [Dkt. 2]; and (2) the estate's motion to stay
certain claims raised by Mr. Suggs in his petition to vacate,
pending arbitration of those claims [Dkt. 19].

---

[1] Mr. Suggs filed a petition to vacate the arbitration award,
which was consolidated with this matter. (See Pet. to Vacate
[Dkt. 1 in Case No. 1:15cv84].)  The parties agree that the
petition to confirm and the petition to vacate necessarily
involve the same substantive issues of fact and law.

For the following reasons, the Court will confirm the arbitration award and deny the motion to stay certain claims.

## I. Background

### A. Factual Background

From the 1980s until his untimely death after a serious illness in March of 2011, Gary Wichard ("Mr. Wichard" or "the agent") was a certified National Football League Players Association ("NFLPA") Contract Advisor and a principal in the sports management firm ProTect Management.  (Pet. to Confirm Arbitration Award ("Pet. to Confirm") [Dkt. 1]; Arbitrator's Opinion & Award ("Op. & Award") [Dkt. 1-5] Ex. D at 4.)  The conduct and services of Contract Advisors, colloquially known as agents, are regulated by the NFLPA Regulations Governing Contract Advisors ("the Regulations").  (Pet. to Confirm Ex. C [Dkts. 1-3, 1-4] Reg. § 3.)  Contract Advisors assist NFL Players in, inter alia, contract negotiations with NFL teams. (Reg. § (1)(B).)  Contract Advisors are prohibited from negotiating on behalf of an NFL player, however, until the agent and player have entered into a Standard Representation Agreement ("SRA").  (Id. at § 3(B)(1).)

On January 3, 2003, Mr. Wichard entered into an SRA with Respondent Terrell Suggs ("Mr. Suggs" or "the player"), a defensive end/linebacker from Arizona State University who was preparing to enter the 2003 NFL Draft.  (Pet. to Confirm Ex. B

2

[Dkt. 1-2] (hereinafter "SRA").)  SRAs are approved by the NFLPA; in fact, the NFLPA logo is affixed at the top of the SRA between Mr. Wichard and Mr. Suggs.  (Id.)  The SRA provided that Mr. Wichard would "act[] in a fiduciary capacity on behalf of [Mr. Suggs] . . . [and] represent, advise, counsel, and assist [Mr. Suggs] in the negotiation, execution, and enforcement of his playing contract(s) in the National Football League."  (Id. at § 3.)  "If [Mr. Wichard] succeed[ed] in negotiating an NFL Player Contract acceptable to [Mr. Suggs]," Mr. Suggs agreed to pay Mr. Wichard "a fee of three percent (3%) of the compensation received by [Mr. Suggs] for each such playing season . . . ."  (Id. at § 4.)  Subsequently, after entering into the SRA, Mr. Suggs was drafted by the Baltimore Ravens in the first round of the 2003 NFL Draft.  (Op. & Award at 5.)

After early success in his professional football career,[2] on July 15, 2009, Mr. Suggs signed a five-year NFL Player Contract with the Baltimore Ravens worth approximately $62.5 million, which also included an option for the 2014 season ("the 2009 Contract").  (Op. & Award at 6; Pet. to Vacate Arbitration Award [Dkt. 1 in Case No. 1:15cv83] (hereinafter "Pet. to Vacate") ¶ 14.)  In 2010, the Baltimore Ravens

---

[2] Mr. Suggs played for the Baltimore Ravens from 2003 to 2009. The terms of his contract during this time period are unclear from the record, but not relevant for the disposition of this matter.

exercised the option under Mr. Suggs' 2009 Contract for the 2014 season, which in effect made the term of the contract six years instead of five years, for the 2009 through 2014 NFL seasons. (Pet. to Vacate ¶ 14.) There is no dispute that Mr. Wichard negotiated the 2009 Contract on Mr. Suggs' behalf.

On December 3, 2010, the NFLPA Committee on Agent Regulation and Discipline ("CARD") suspended Mr. Wichard's certification as a Contract Advisor for improper contact with a prospective NFL player who, at the time, was ineligible to be drafted. (Op. & Award at 6.) The nine-month suspension prohibited Mr. Wichard from (1) recruiting and signing NFL players to SRAs and (2) negotiating NFL Player Contracts with NFL teams on behalf of NFL players. (Id.) The suspension did not prevent Mr. Wichard from receiving fees or performing under NFL Player Contracts that he previously negotiated, which included the 2009 Contract. (Id. at 6-7.) Mr. Wichard agreed to the terms of the suspension. (Id. at 7.) The same day, Mr. Wichard sent a memorandum to all clients of ProTect Management, advising them of the suspension, stating in part:

> Absolutely nothing will change for any existing clients. I will still be able to provide the **EXACT** same services as an agent that I always have. I will still be able to communicate with NFL teams on your behalf. What I will not be able to do for nine months is recruit new clients. Once again, I just want to stress that this suspension will not affect existing clients in any way.

4

> Please contact me with any concerns you
> have.

(Id. at 7 (emphasis in original).)

Approximately four months later, on March 11, 2011, Mr. Wichard died. (Op. & Award at 8.) On March 15, 2011, ProTect Management sent a memorandum to all clients, which stated in relevant part:

> It was [Mr. Wichard's] wish to keep ProTect
> Management operating even after his [death].
> In light of [Mr. Wichard's] wishes we are
> proud to announce that ProTect Management
> will be honoring [Mr. Wichard] by continuing
> to function as we have for [the] last three
> decades. As a certified NFL Contract
> Advisor, Jason Chinn [("Mr. Chinn")] will
> continue to run the day-to-day operations
> for ProTect. As always, please feel free to
> contact any of us with any questions or
> concerns. We really appreciate all of your
> understanding and support.

(Id.) On November 15, 2011, Mr. Suggs signed a new SRA with Contract Advisor Joel Segal, who is not associated with ProTect Management.[3] (Id. at 9.) Mr. Suggs was named the NFL's Defensive Player of the Year for the 2011 NFL season. (Id. at 10.)

During the period of Mr. Wichard's illness and/or following his death, Mr. Suggs received two reprimands from the Baltimore Ravens on October 8, 2010 and November 16, 2011. (Op.

---

[3] On February 17, 2014, Mr. Suggs signed a five-year NFL Player Contract with the Baltimore Ravens that was negotiated by Mr. Segal on Mr. Suggs' behalf. (Id.)

5

& Award at 8.)  Mr. Suggs also received several fines totaling $42,500 from the NFL for violations of the uniform rules, or as penalties imposed for unnecessary roughness or grabbing the face mask of an opposing player, in the following amounts on the following dates: (1) $10,000 on December 7, 2010; (2) $15,000 on January 4, 2011; (3) $7,500 on September 27, 2011; (4) $5,000 on October 5, 2011; and (5) $5,000 on November 15, 2011.  (Id. at 8-9.)  Mr. Suggs did not appeal any of these fines.  (Id. at 9.)

It is undisputed that Mr. Suggs paid Mr. Wichard, ProTect Management, or Mr. Wichard's Estate the three-percent fee under the SRA for the 2009, 2010, 2011, and 2012 NFL Seasons, which was calculated based on the compensation that Mr. Suggs received from the Baltimore Ravens for each individual season.  (Op. & Award at 10; Pet. to Vacate at ¶ 23 ("From 2009 to 2012, Mr. Suggs continued to pay fees totaling $1,449,000 to the Wichard Estate.").)

On November 12, 2013, ProTect Management sent Mr. Suggs an invoice for Contract Advisor fees in the amount of $192,000, which constituted three percent of Mr. Suggs' $6,400,000 compensation for the 2013 NFL Season.  (Op. & Award at 10.)  Mr. Suggs played for the Baltimore Ravens during the 2013 NFL Season pursuant to the 2009 Contract negotiated by Mr. Wichard.  (Id.)  This invoice remains unpaid by Mr. Suggs. (Id.)  The amount allegedly owed under the unpaid invoice for

the 2013 NFL Season subsequently became the subject of the underlying arbitration proceeding.

B. The Dispute

Under the Regulations, arbitration is the "exclusive method for resolving any and all disputes" between NFL Players and Contract Advisors. (Reg. § 5(A).) On March 1, 2014, and pursuant to sections 5(A) and 5(B) of the Regulations, Petitioner Maire Wichard, in her capacity as Executor of the Estate of Mr. Wichard ("the Estate"), filed a grievance against Mr. Suggs with the NFLPA for the amount of the unpaid invoice from the 2013 NFL Season. (Op. & Award at 11.) In the grievance, the Estate claimed that Mr. Suggs owed $192,000 in Contract Advisor fees plus interest under the terms of the SRA, and argued that nothing had occurred to invalidate his obligation to pay. (Id.)

On March 14, 2014, Mr. Suggs rejected the Estate's grievance in full and denied that the Estate was entitled to the fee it claimed. (Op. & Award at 11.) Mr. Suggs filed a cross-grievance against the Estate and ProTect Management. (Id.) Mr. Suggs claimed that after Mr. Wichard's death, he was left without representation and without a fiduciary, which he had bargained for in exchange for fee payments under the SRA. (Id.) Specifically, in his grievance, Mr. Suggs claimed he was harmed in the following ways: (1) he was unable to reap any monetary

7

benefits from being named 2011 NFL Defensive Player of the Year in the form of marketing or endorsement deals; (2) he did not have a Contract Advisor to represent him and advise him regarding the various fines he received; (3) he could not pursue any possible marketing opportunities; and (4) he did not renegotiate his contract with the Baltimore Ravens during the peak of his performance in 2011.  (Id. at 10-12.)

On April 2, 2014, the Estate answered Mr. Suggs' grievance, arguing (1) Mr. Suggs retained a new Contract Advisor approximately three months before he was named 2011 Defensive Player of the Year, and (2) any harm Mr. Suggs incurred between Mr. Wichard's death in March of 2011 and the hiring of a new Contract Advisor in November of 2011 was attributable only to Mr. Suggs' failure to hire new representation.  (Id. at 12.) Based on the inability of the parties to resolve the dispute, the matter proceeded to arbitration to determine "[w]hat monies, if any, does Terrell Suggs owe the Estate of Gary Wichard for services rendered as his Contract Advisor during the 2013 NFL Season?"  (Id. at 2.)

C. The Arbitration Proceeding

On September 23, 2014, the parties appeared before an NFLPA-appointed arbitrator in Alexandria, Virginia to present evidence in support of their grievances.  (Pet'r Reply in Supp. of Pet. to Confirm Ex. H [Dkt. 25-1] (hereinafter "Hr'g Tr.").)

8

The arbitrator received seventeen documentary exhibits and heard oral testimony through direct and cross-examination of Ms. Wichard and Mr. Suggs.  (Id.)  The parties also filed post-hearing briefs.  On December 4, 2014, the arbitrator issued an Opinion and Award sustaining the Estate's grievance and denying Mr. Suggs' grievance.  (Op. & Award at 18-19.)  (Id. at 13-17.)

The arbitrator found that under the SRA, Mr. Wichard was required to represent, advise, counsel, and assist Mr. Suggs in the negotiation, execution, and enforcement of his NFL Player Contract with the Baltimore Ravens.  (Op. & Award at 14.)  Mr. Wichard fulfilled one of these functions by negotiating the 2009 Contract with the Ravens on Mr. Suggs' behalf.  (Id. at 13-14.)  Otherwise, the arbitrator found Mr. Wichard failed to fulfill his enforcement function, because he did not represent Mr. Suggs in the negotiation or reduction of any of the fines he received in 2010 and 2011.  (Id. at 14-15.)  Thus, the arbitrator concluded that Mr. Suggs owed Contract Advisor Fees in the amount of $172,800, which was the full amount of the unpaid invoice for the 2013 NFL Season ($192,000), less ten percent ($1,920) attributable to possible fine reduction.  (Id. at 18.)

Under the Regulations, this decision constituted the "full, final and complete disposition of the grievance, and [is] binding upon the player and Contract Advisor involved[.]"  (Reg. § 5(E).)

D. Procedural Background

On January 2, 2015, after not receiving payment from Mr. Suggs within ten days of the award, the Estate filed the instant Petition to Confirm the Arbitration Award against Mr. Suggs.  Pursuant to 9 U.S.C. § 9, the Estate asks the Court to confirm the arbitration award as valid and final, and for entry of judgment against Mr. Suggs in the amount of $172,800 plus interest from December 4, 2014, the date of the initial award. (Pet. to Confirm at 4-5.)  A short time thereafter, on January 22, 2015, Mr. Suggs filed a Petition to Vacate the Arbitration Award, claiming it violates the essence of the SRA and ignores Mr. Wichard's obligations to Mr. Suggs.  (Pet. to Vacate at 13-14.)  After consolidation of the two cases, the Estate also filed a Motion to Stay and Sever Certain Claims Pending Arbitration and to Strike Certain Allegations from the Petition filed by Mr. Suggs (Mot. to Stay [Dkt. 19].)  The Estate's Petition to Confirm the Award, Mr. Suggs' Petition to Vacate the Award, and the Estate's Motion for a Stay on Certain Claims have all been extensively briefed by the parties.  The Court heard argument of counsel on March 19, 2015.  Thus, the matter is ripe for disposition.

## II. Legal Standard

Federal courts favor arbitration agreements and awards stemming from such agreements.  Arrowhead Global Solutions, Inc.

v. Datapath, Inc., 166 F. App'x 39, 43 (4th Cir. Feb. 3, 2006)
(unpublished per curiam).  To further this policy in favor of
arbitration, "[j]udicial review of an arbitration award in
federal court is severely circumscribed." Wachovia Sec., LLC v.
Brand, 671 F.3d 472, 478 (4th Cir. 2012) (quoting Apex Plumbing
Supply, Inc. v. U.S. Supply Co., Inc., 142 F.3d 188, 193 (4th
Cir. 1998)) (internal quotations omitted).  Limited judicial
review effectuates the very purpose of arbitration.  See, e.g.,
Apex Plumbing, 142 F.3d at 193 ("[T]o allow full scrutiny of
such awards would frustrate the purpose of having arbitration at
all--the quick resolution of disputes and the avoidance of the
expense and delay associated with litigation.") (citation
omitted); Brand, 671 F.3d at 478 ("A court sits to determine
only whether the arbitrator did his job--not whether he did it
well, correctly, or reasonably, but simply whether he did it.")
(internal quotation marks and citations omitted).  Indeed, the
Court's function here "is intended to be summary: confirmation
can only be denied if an award has been corrected, vacated, or
modified in accordance with the Federal Arbitration Act."
Taylor v. Nelson, 788 F.2d 220, 225 (4th Cir. 1986).  Thus,
federal courts must confirm an arbitration award absent "a
showing of one of the grounds listed in the Federal Arbitration
Act, or if the arbitrator acted in manifest disregard of law."

Apex Plumbing, 142 F.3d at 193 (citation omitted); see also 9 U.S.C. § 9.

Stated differently, "to prevent arbitration from becoming a preliminary step to judicial resolution . . . [a]n arbitration award will not be set aside unless it is irrational or evidences manifest disregard for law." Apex Plumbing, 142 F.3d at 193 n.5 (citing Eljer Mfg., Inc. v. Kowin Dev. Corp., 14 F.3d 1250 (7th Cir. 1994), cert. denied, 512 U.S. 1205 (1994); Upshur Coals Corp. v. United Mine Workers of Am., Dist. 31, 933 F.2d 225, 229 (4th Cir. 1991)).  The statutory justifications for vacating, modifying, or correcting an award as prescribed in 9 U.S.C. § 10(a) are inapplicable to the facts of this case; indeed, Mr. Suggs does not ask the Court to vacate the award on this basis.  Instead, Mr. Suggs relies on common law grounds, which "include those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 234 (4th Cir. 2006) (citing Apex Plumbing, 142 F.3d at 193 n.5).

An arbitration award fails to draw its essence from the contract "when an arbitrator has disregarded or modified unambiguous contract provisions or based an award upon his own personal notions of right and wrong." Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC, 519 F.3d 200, 207 (4th Cir. 2008)

12

(quotation marks omitted).  Notably, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does <u>not</u> suffice to overturn his decision."  <u>Id.</u> (quotation marks omitted and emphasis added). In this regard, a court's conclusion that "an arbitrator has misread the contract" is simply not sufficient to vacate the arbitration award.  <u>Id.</u> (quotation marks omitted).

An arbitration award evidences a manifest disregard of the law "where the arbitrator understands and correctly states the law, but proceeds to disregard the same."  <u>Patten</u>, 441 F.3d at 235 (citing <u>Upshur Coals Corp.</u>, 933 F.2d at 229) (internal alterations omitted).  Such manifest disregard for the law necessarily results in an award that is "not rationally inferable from the contract," but instead a product of the arbitrator's amendment or alteration of the contract at issue. <u>Id.</u> at 236-37 (quoting <u>Mo. River Serv., Inc. v. Omaha Tribe of Neb.</u>, 267 F.3d 848, 855 (8th Cir. 2001) (internal quotation marks omitted); <u>Apex Plumbing</u>, 142 F.3d at 193 n.5).

In short, by seeking to vacate the arbitration award, Mr. Suggs "shoulders a heavy burden."  <u>Patten</u>, 441 F.3d at 235 (quoting <u>Remmey v. PaineWebber, Inc.</u>, 32 F.3d 143, 149 (4th Cir. 1994)).  With this standard in mind, the Court now turns to the merits of the parties' arguments.

## III. Analysis

Contract interpretation "is a question for the arbitrator.  It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworks of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 599 (1960) (citing United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564 (1960)).  Moreover, in addition to the deference afforded to the arbitrator's legal conclusions and contract interpretation, the Court must also defer to the arbitrator's findings of fact. Upshur Coals, 933 F.2d at 229.  Under this extremely deferential standard and limited review of the arbitration award,[4] the Court will confirm the award in the Estate's favor.

### A. Petitions to Confirm and Vacate Arbitration Award

The analysis begins with the presumption that the Court should confirm the arbitration award. Apex Plumbing, 142 F.3d at 193 (citation omitted); see also 9 U.S.C. § 9.  To overcome this presumption, Mr. Suggs argues the arbitration award should be vacated because (1) the arbitrator acted in

---

[4] The Court has jurisdiction over this matter because the arbitration award was rendered in Alexandria, Virginia.  See 9 U.S.C. § 9 (stating an application to confirm an arbitration award "may be made to the United States court in and for the district within which such award was made.").

14

manifest disregard of the law, (2) the award does not draw its essence from the SRA, and (3) the award violates public policy. (See generally Resp't Opp'n to Pet. to Confirm [Dkt. 24]; Resp't Reply in Supp. of Pet. to Vacate [Dkt. 29].)  The Court is not persuaded by any of these arguments.

First, Mr. Suggs claims that the arbitrator recognized the plain language of the SRA when he identified the three duties Mr. Wichard owed to Mr. Suggs under the SRA--negotiation, execution, and enforcement of the 2009 Contract--but disregarded those provisions when issuing the award.  (Resp't Reply at 3-4.) The Court would overstep the bounds of limited judicial review if it accepted this argument.  See United Steelworks, 363 U.S. at 599.  The arbitrator interpreted the SRA and ultimately determined the Estate was entitled to the fee from the 2013 NFL Season, less ten percent for the possibility of any fine reduction, had Mr. Wichard acted to reduce those fines.  This interpretation is entitled to deference and is rationally inferable from the SRA.  Cf. Patten, 441 F.3d at 236-37 (finding the arbitrator amended or altered the agreement and thus, the arbitration award was not rationally inferable from the contract) (citation omitted).  There is nothing in the record to suggest that the arbitrator amended or altered the terms of the SRA, which is necessary for a finding of manifest disregard. Id.  Instead, the arbitrator took into account Mr. Suggs'

contentions and factored them into his decision when he awarded the Estate $172,800.  The arbitrator's legal conclusions are supported by law and a plain reading of the SRA.  Mr. Suggs' arguments in this regard are nothing more than dissatisfaction with the outcome of arbitration, which is not a sufficient basis to vacate the award.  See Remmey, 32 F.3d at 146 ("[P]arties may not seek a 'second bite at the apple' simply because they desire a different outcome.").  Thus, the Court will not vacate the award on this basis.

Second, Mr. Suggs claims the award does not draw its essence from the SRA, because Mr. Wichard was required to act as Mr. Suggs' fiduciary at all relevant times.  (Resp't Reply at 4-6.)  This second argument is a variation of Mr. Suggs's first argument, and it too must fail.  The arbitrator's award is based on a rather simple rule pursuant to the terms of the SRA: once a Contract Advisor negotiates a contract with an NFL team on behalf of an NFL player, under the SRA, the Contract Advisor is entitled to his fee after the NFL player receives compensation for a season under that negotiated contract.  Here, it is undisputed Mr. Wichard negotiated the 2009 Contract for Mr. Suggs.  It is also undisputed that Mr. Suggs played the 2013 NFL Season and was compensated as a result.  The arbitrator thus concluded the Estate was entitled to the fee from the 2013 NFL Season.  The arbitrator also noted that Mr. Suggs complied with

his contractual obligations under the SRA by paying Mr. Wichard, or his Estate, the fee for 2009, 2010, 2011, and 2012, even after Mr. Wichard had died.[5]

In short, the arbitrator's conclusion is the essence of Standard Representation Agreements between Contract Advisors and NFL Players. The explicit language of the fee provision in the SRA is predicated on compensation received by the player for a season that was played under a contract negotiated by the agent. (See SRA § 4 ("If Contract Advisor succeeds in negotiating an NFL Player Contract . . . Contract Advisor shall receive a fee of three percent (3%) of the compensation received by Player for each such playing season[.]") (emphasis added).) The arbitrator concluded that receipt of the three-percent fee is not contingent upon Mr. Wichard's performance as a fiduciary or through his enforcement of the 2009 Contract. Instead, the receipt of the fee is only contingent upon (1) the successful negotiation of the 2009 Contract and (2) compensation received by Mr. Suggs from the Baltimore Ravens for playing in an NFL season under the negotiated contract. This interpretation of

---

[5] The arbitrator concluded that these payments until 2013 were the "best evidence" that Mr. Suggs "understood his continued obligation to pay Wichard or the Estate the Contract Advisor fees." (Op. & Award at 16-17.) It is also undisputed that Mr. Suggs was fiercely loyal to Mr. Wichard, even after his illness and death, which illustrates the regrettable and unfortunate nature of this litigation. (Hr'g Tr. at 79 ("Q: I think the answer is pretty obvious but I have to ask you anyhow, Terrell. Why did you stay with Gary? A: Because I loved him.").)

the SRA properly "constru[es] and appl[ies] the contract" and is thus drawn from the essence of the SRA.  Choice Hotels, 519 F.3d at 207 (quotation marks omitted).

Stated differently, Mr. Wichard's fee vested the moment he negotiated the 2009 Contract on Mr. Suggs' behalf, and the amount of that fee was finalized once Mr. Suggs received compensation for playing an NFL season negotiated under the 2009 Contract.[6]  Negotiation of the contract and receipt of payment under the contract are necessary and sufficient conditions, which have been satisfied here, and thus require the payment of the fee.  And even if the Court concluded that the arbitrator misread the SRA--to be clear, it does not--this would still not be an appropriate basis to vacate the award.  See Three S Delaware, Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 528 (4th Cir. 2007) ("An arbitration award, however, does not fail to draw its essence from the agreement merely because a court concluded that an arbitrator has misread the contract.")

---

[6] The plain language of section 12 of the SRA also supports this conclusion.  Under the SRA, either party may terminate the relationship through written notice.  If such termination "occurs after Player has signed an NFL player contract negotiated by Contract Advisor, Contract Advisor shall be entitled to the fee prescribed in Section 4 above for negotiation of such contract(s)."  (SRA § 12.)  Thus, even if Mr. Suggs had terminated the SRA with Mr. Wichard, it appears he would still be liable to pay a fee to Mr. Wichard "for negotiation of such contract(s)."  This provision lends support to the Court's conclusion, and shows that SRAs are drafted in a Contract Advisor's favor, especially after successful negotiation of an NFL contract for the player.

(citations omitted).  Accordingly, the Court will also not vacate the award on this basis.  See Poston v. NFLPA, No. 02CV871 (JCC), 2002 WL 31190142, at *5 (E.D. Va. Aug. 26, 2002) ("[T]he use of [the] concept of manifest disregard to vacate an arbitration award was upheld by a federal court of appeals in only two instances during the forty-seven years between its first clear articulation [by the Supreme Court in 1953] . . . and the Sixth Circuit's examination of the issue in 2000.") (citing Wilko v. Swan, 346 U.S. 427, 436 (1953); Dawahare v. Spencer, 210 F.3d 666, 670 (6th Cir. 2000) (citations omitted)).

Finally, Mr. Suggs contends that the award violates public policy because it relieves Mr. Wichard of his fiduciary duties while allowing the Estate to reap the rewards under the SRA.  (Resp't Reply at 6-7.)  For support, Mr. Suggs cites a bankruptcy case from the Western District of Kentucky that states: "Under the law, a contract containing such a clause which prevents a party from fulfilling his or her fiduciary duty is void as a violation of public policy."  (Id. (citing In re Big Rivers Elec. Corp., 233 B.R. 739, 753 (W.D. Ky. 1998) (citation omitted)).  This final argument also fails.

> Rooted in the "general doctrine . . . that a court may refuse to enforce contracts that violate law or public policy," [United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 42 (1987),] a court may vacate an arbitration award only when (1) the public policy is "well defined and

> dominant, as ascertained by references to the laws and legal precedents and not from general considerations of supposed public interests," and (2) the award itself is a clear violation of public policy.

Octagon, Inc. v. Richards, No. 1:10-CV-652, 2010 WL 3932272, at *7 (E.D. Va. Oct. 5, 2010) (citing W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 766 (1983); Misco, 484 U.S. at 43). Unlike Mr. Suggs suggests, the arbitrator did not allow Mr. Wichard to disregard all of his duties under the SRA. And there is no provision in the SRA that "prevents a party from fulfilling his" fiduciary duty. Instead, the arbitrator's final award reflected Mr. Wichard's failure to perform his enforcement function under the SRA. Yet, at the same time, Mr. Wichard is still entitled to his fee for negotiating the 2009 Contract for the reasons discussed above under a plain reading of the SRA. When one steps back from the minutiae of this case, the result could be perceived as unfair: indeed, an NFL Player is obligated to pay a commission to his agent who was deceased for the majority of the six-year contract. But Mr. Suggs expressly bargained for this outcome when he entered the SRA with Mr. Wichard. The SRA is not only approved by the NFLPA, it is required by the NFLPA, the labor association concerned with protecting the rights of NFL players. By requiring the use of the SRA, the NFLPA implicitly certifies the obligations therein,

which clearly favor Contract Advisors who successfully negotiate contracts on the player's behalf.  This Court will not re-write the terms of the SRA; that can only be done by the NFLPA, Contract Advisors, and the NFL.

Regardless, the Court finds that Mr. Suggs has failed to show how the award violates public policy, especially given the arbitrator's consideration of Mr. Suggs' arguments regarding his fine exposure.  This conclusion and outcome does not violate any public policy, but instead incorporates the agent's contractual obligations under the SRA.  Therefore, the petition to vacate the award is denied on this basis as well.  See Octagon, 2010 WL 3932272, at *8 ("Defendant has not met the heavy burden required to vacate an arbitration award on these grounds.  This is not one of the rare instances where this Court will vacate an arbitration award based on public policy.").

Ultimately, the arbitration award is entitled to deference.  Apex Plumbing, 142 F.3d at 193 ("[T]o allow full scrutiny of such awards would frustrate the purpose of having arbitration at all--the quick resolution of disputes and the avoidance of the expense and delay associated with litigation.") (citation omitted).  The arbitration award draws its essence from the SRA and does not manifestly disregard the law.  Therefore, the Court will confirm the arbitration award and deny and dismiss Mr. Suggs' petition to vacate the award.

### B. The Estate's Request for Prejudgment Interest

The Estate also asks for prejudgment interest at a rate of ten percent under California law from December 4, 2014, the date the arbitration award was rendered. (Pet. to Confirm at 5.)  Mr. Suggs does not address or expressly oppose this request in his opposition brief. (See Resp't Opp'n [Dkt. 24].) The Court will award prejudgment interest from December 4, 2014 to the date of this opinion and accompanying Order.

"Post-award, prejudgment interest is generally awarded at the discretion of the district court, and there is a presumption in favor of awarding such interest." In re Arbitration Between Westchester Fire Ins. Co. v. Massamont Ins. Agency, Inc., 420 F. Supp. 2d 223, 226-27 (S.D.N.Y. 2005) (citing In re Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd., 737 F.2d 150, 153-54 (2d Cir. 1984)) (additional citation omitted); see also Elevation Franchise Ventures, LLC v. Rosario, No. 1:13-cv-719 (AJT/JFA), 2013 WL 5962984, at *1 (E.D. Va. Nov. 6, 2013) (awarding interest by summary order on the arbitration award from the date of the award to the date of entry of default judgment).  To determine the applicable interest rate, the Court must first determine what law applies.  Regardless of whether the Court has jurisdiction by diversity of citizenship or under the FAA, state law controls the applicable prejudgment interest rate.  See

22

Massamont Ins. Agency, Inc., 420 F. Supp. 2d at 226-27 ("The
state statutory rate is to be applied even where, as here,
federal law governs enforcement of the arbitration award."); see
also Thornhill v. Donnkenny, Inc., 823 F.2d 782, 787 (4th Cir.
1987) (finding that Virginia's conflict of law rules, which are
used in diversity actions, generally honor contractual choice of
law provisions) (citing Bryant Elec. Co., Inc. v. City of
Fredericksburg, 762 F.2d 1192, 1196 n.8 (4th Cir. 1985).

Here, the SRA, the underlying contract at issue, is
"construed, interpreted and enforced according to the laws of
the State of California."  (SRA § 13.)  Under California law,
interest accrues at a rate of ten percent from the date of the
arbitration award resolving the contractual dispute, to the date
of judgment in this Court affirming the arbitration award.  See
Britz, Inc. v. Alfa-Laval Food & Dairy Co., 40 Cal. Rptr. 2d
700, 713-14 (Cal Ct. App. 1995); see also SCIE LLC v. XL
Reinsurance Am., Inc., 397 F. App'x 348, 352-53 (9th Cir. Sept.
27, 2010); Cal. Civ. Code § 3289(b).  Accordingly, the Court
will award $5,702.40 in prejudgment interest, which is
calculated at ten percent per annum on the principal amount
owed, $172,800.00, from December 4, 2014 to the date of this
opinion and accompanying Order confirming the arbitration award.

### C. Mr. Suggs' Alternative Request for Discovery

In the alternative to his request that the Court vacate the award, Mr. Suggs asks that this matter be stayed pending a limited period of discovery.  "The district court has discretion to deny discovery in a proceeding to confirm an arbitral award." Lyeth v. Chrysler Corp., 929 F.2d 891, 898 (2d Cir. 1991) (citing Imperial Ethiopian Gov't v. Baruch-Foster Corp., 535 F.2d 334, 337 (5th Cir. 1976) ("The loser in arbitration cannot freeze the confirmation proceedings in their tracks and indefinitely postpone judgment by merely requesting discovery.")).  In some instances, a district court may permit discovery in a post-arbitration proceeding when such discovery is "relevant and necessary to the determination of an issue raised by such an application." See, e.g., ARMA, S.R.O. v. BAE Sys. Overseas, Inc., 961 F. Supp. 2d 245, 261 (D.D.C. 2013). However, the Court has broad discretion to control discovery. Flame S.A. v. Indus. Carriers, Inc., No. 2:13-cv-658, 2014 WL 3895933, at *14 (E.D. Va. Oct. 8, 2014) (citing cases). Generally, discovery in post-arbitration review proceedings is typically limited, or not necessary at all, given the deference this Court owes the arbitrator's findings of fact and conclusions of law.  See Lyeth, 929 F.2d at 898; see also Upshur Coals, 933 F.2d at 229.

Here, Mr. Suggs notes that the parties did not engage in discovery during arbitration, and asks for limited discovery in this matter, claiming discovery is relevant and necessary to determine whether Mr. Wichard and/or ProTect Management fulfilled its contractual and fiduciary obligations to Mr. Suggs under the SRA. (Resp't Opp'n at 19.) Specifically, Mr. Suggs requests discovery concerning any effort by ProTect Management or Mr. Chinn to contact and provide advice or services to Mr. Suggs after Mr. Wichard's death, which would necessitate, at the very least, deposing Ms. Wichard in order to explore these alleged efforts. (Id.)

Having already determined that the arbitration award will be confirmed for the reasons discussed above, the Court finds that discovery is not relevant nor is it necessary. Rather, any discovery would needlessly protract a proceeding that is intended to be summary in nature, and thus defeat the purpose of the binding arbitration provision in the Regulations. See Apex Plumbing, 142 F.3d at 193; see also Taylor, 788 F.2d at 225 (holding post-arbitration judicial review "is intended to be summary"). Therefore, the Court will also deny Mr. Suggs' request for discovery. See Lyeth, 929 F.2d at 898.

### D. Claims Regarding the 2014 NFL Season

Lastly, in his petition to vacate the arbitration award, Mr. Suggs raises claims related to Mr. Wichard's fee for

the 2014 NFL season.  (Pet. to Vacate at 8, 14 ("Mr. Suggs

respectfully requests that this Court enter an Order . . .

declaring that neither the Wichard Estate nor Pro Tect [sic] is

entitled to receive any further fees under the 2009 Contract,

including fees for the 2014 NFL season.").)  It is undisputed

that the arbitration award at issue in this litigation involved

only the 2013 NFL Season.  The parties have not yet arbitrated

claims related to the 2014 NFL season, the final season under

the 2009 Contract.

Under section five of the Regulations, arbitration is

the exclusive method for disputes between player and agent, and

Mr. Suggs cannot present claims to this Court without first

proceeding through arbitration.  See Reg. § 5(A); see also

Blount v. Northrup Grumman Info. Tech. Overseas, No. 1:14cv919

(JCC/TCB), 2014 WL 5149704, at *3 (E.D. Va. Oct. 14, 2014) ("If

there is a failure or refusal to arbitrate under a written

agreement, an aggrieved party may petition the court 'for an

order directing that such arbitration proceed in the manner

provided for in such agreement.'") (quoting 9 U.S.C. § 4).  But

the Estate is not asking that this Court compel Mr. Suggs'

participation in arbitration.  Instead, the Estate asks only for

a stay of these claims pending arbitration.  This request for a

stay is premature because the parties have not even attempted to

arbitrate any issues regarding the 2014 NFL Season--in fact,

there may be no issue that requires arbitration at all.[7]  The
only issue before the Court at this time is whether the
arbitration award regarding the 2013 NFL Season should be
confirmed.  The Court has answered this question in the
affirmative and will confirm the award.  Any issues regarding
the 2014 NFL Season are not properly before the Court for
adjudication.  Accordingly, the Estate's motion to stay will be
denied and Mr. Suggs' petition to vacate the award will be
denied and dismissed in its entirety.

### IV. Conclusion

For the foregoing reasons, the Court will confirm the
arbitration award and deny the motion to stay claims pending
arbitration.  An appropriate Order shall issue.


|  | /s/ |
|---|---|
| March 24, 2015 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |

---

[7] Stated differently, after the issuance of this opinion and
accompanying Order confirming the arbitration award regarding
the 2013 NFL Season, there may be no need to arbitrate claims
regarding the 2014 NFL Season--the parties could agree that Mr.
Suggs is required to pay the fee.  (See Resp't Mem. in Opp'n to
Pet'r Mot. to Stay [Dkt. 28] at 8-9 ("Any future arbitration
regarding the Wichard Estate's right to the 2014 Fees
necessarily will involve the same parties and the same issues
that have already been arbitrated and decided by Mr. Kaplan and
that are now before this Court. . . . [S]hould this Court
confirm Mr. Kaplan's decision, Mr. Suggs would be precluded from
litigating that he is not required to pay the 2014 Fees to the
Wichard Estate.").)  Or there could still be a dispute that
requires additional arbitration or judicial intervention.
However, this is not for the Court to decide.